# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 7 |
| JASON B. GOODIN, | ) ) ) | Case No. 21-40562-EDK |
| Debtor | ) ) ) |  |
| SUSAN LEBEL, | ) ) ) | Adversary Proceeding No. 21-4030-EDK |
| Plaintiff | ) ) ) |  |
| v. | ) ) |  |
| JASON B. GOODIN | ) ) ) |  |
| Defendant | ) ) |  |

## MEMORANDUM OF DECISION

Before the Court, after trial, is a complaint filed by judgment creditor Susan LeBel ("LeBel") against Jason B. Goodin, the debtor in the underlying Chapter 7 bankruptcy case (the "Debtor").[1] In this adversary proceeding, LeBel seeks a denial of the Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(3), and (a)(4) and/or a ruling that a judgment previously entered in favor of LeBel against the Debtor is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (6) as a debt incurred by fraud and/or on account of a willful and malicious injury.[2]

---

[1] The complaint also named J&D Investment Group, Inc. as a defendant. However, as none of the counts in the complaint are applicable to non-debtor third parties, J&D Investment Group, Inc. was dismissed as a defendant.

[2] All statutory references in this Memorandum are to provisions of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code" or the "Code"), unless otherwise noted. And, unless otherwise indicated, all references to the "Rules" or "Bankruptcy Rules" are to the Federal Rules of Bankruptcy Procedure.

1

Pursuant to Bankruptcy Rule 7052, the following constitute the Court's findings of fact and conclusions of law.

I. FACTS AND POSITIONS OF THE PARTIES

The factual findings contained in this Memorandum are based on trial testimony, the admitted evidence, and the Court's own records. *See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.),* 196 F.3d 1, 8 (1st Cir. 1999). The following is a brief summary of the relevant facts; more detailed findings of fact are incorporated in the Discussion section, Part II, below.

In 2015, Boneat Goodin ("Boneat," the Debtor's then spouse) approached Kevin Bevis, (Boneat's father and LeBel's long-term partner) seeking funds to assist the Debtor in opening a restaurant. After a meeting between Bevis, LeBel, Boneat, and the Debtor, LeBel agreed to a loan for $50,000, and the Debtor, Boneat, and J&D Investment Group, Inc. ("J&D Investment")[3] signed a promissory note to LeBel in the amount of $50,000. Pursuant to the promissory note, the loan term ran from January 1 to December 31, 2016, with monthly payments of $500, which payments included 6% interest and a portion of the principal.

On February 29, 2016, LeBel loaned the parties an additional $10,000, and the same parties executed a second promissory note for that loan on April 9, 2016. The second promissory note had a loan term of March 1, 2016 to December 31, 2016, with monthly payments of $232.32, representing a one-time 6% interest payment of $600 and reimbursement to LeBel of $1,500 for capital gains taxes that she was going to owe after liquidating stocks to fund the loan.

---

[3] There are discrepancies regarding the business's name in various pleadings and exhibits filed with the Court. In some instances, the business is referred to as "J&D Investment Group, Inc." and in others as "J&D Investments Group, LLC." Throughout the remainder of this Memorandum, the business will simply be referred to as "J&D Investment."

2

On December 31, 2016, the balance of the note ($10,000) would be due. The promissory note included a statement that the parties were "already in arrears $1,000 on the other note." Pl. Ex. 2, 5.

Both promissory notes contained sections entitled "Security," stating that the notes would be secured by a deed of trust covering the Debtor's and Boneat's home in Dracut, Massachusetts (the "Dracut home"), and in the case of a default, the borrowers agreed to transfer the ownership of J&D Investment, doing business as East Street Grille (the "Restaurant") to LeBel. There was no evidence that any purported security interest under the notes was properly perfected, although the parties stipulated that the loans were secured by the Dracut home and the Restaurant's assets.

Despite repeated requests from LeBel, including written demands for payment, the Debtor never made any of the required monthly payments or the final payments on the notes when they came due on December 31, 2016.

Subsequently, the Debtor and Boneat filed for divorce, which was finalized in June 2018. In connection with the divorce, the probate court ordered the sale of the Dracut home and the Restaurant. The divorce decree stated, in part, that "until the [Dracut home] is conveyed …, the Wife shall continue to have sole and exclusive use of the [Dracut home], and the Wife shall be financially responsible to pay all the utilities, current mortgage, and taxes for the [Dracut home]." Pl. Ex. 18. The decree also ordered the sale of the Restaurant to pay "meals taxes and any other restaurant-related taxes, in regard to transferring the business in the sales transaction." *Id.*

In August 2018, the Debtor introduced LeBel to a potential buyer for the Restaurant. The individual claimed to be an attorney and indicated that he would assume the debts owed to LeBel. LeBel says that, through online research, she discovered an article regarding that individual's

3

criminal history. She alerted the Debtor to her reservations regarding the buyer's character and did not proceed with the sale.

In October 2018, the Restaurant was under a sales agreement with a different buyer, contingent on the transfer of the Restaurant's liquor license to the purchaser. However, due to outstanding meals taxes, the Massachusetts Department of Revenue (the "MDOR") declined to issue a Certificate of Good Standing required for the liquor license transfer. Thereafter, in November 2018, the MDOR placed a lien on all J&D Investment's property.

At the end of November 2018, LeBel filed a complaint for breach of contract against the Debtor, Boneat, and J&D Investment in Massachusetts Superior Court. In March 2019, the Superior Court issued a prejudgment attachment on the Restaurant and the Dracut home, notice of which was served on the Debtor and Boneat. The Debtor, Boneat, and J & D Investment did not answer the Superior Court complaint and a default judgment in the amount of $77,851.34 was entered on September 25, 2019 (the "Judgment").

In October 2019, the MDOR foreclosed on the Restaurant's assets. The auction sale netted proceeds of $5,500, an amount insufficient to cover the meals taxes owed. LeBel received nothing from the sale of the Restaurant's assets.

In the interim, in May 2019, the Dracut home was listed for sale, but a private sale never came to fruition. The Dracut home was eventually sold at a foreclosure auction in January 2020. After payment to the mortgage holder, there were no excess proceeds, and LeBel received nothing from the sale of the Dracut home.

In December 2020, LeBel filed a motion for trustee process in the Superior Court seeking to attach the Debtor's, Boneat's and J & D Investment's bank accounts in order to satisfy the $77,851.34 judgment. On December 29, 2020, the Superior Court ordered that the defendants

4

were prohibited from moving any funds or in any way modifying or dissipating the accounts or property which the plaintiff was seeking to attach until the court heard from the parties at a later hearing. Subsequently, on January 4, 2021, the Superior Court granted LeBel's trustee process motion.

On July 21, 2021, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code, and, on October 26, 2021, LeBel commenced the present adversary proceeding against the Debtor by filing a five-count complaint seeking a determination that the Judgment against the Debtor is nondischargeable pursuant to §§ 523(a)(2) and (a)(6) and that the Debtor's discharge should be denied pursuant to §§ 727(a)(2), (a)(3), and (a)(4). A trial was conducted on April 25, 2024. Three witnesses testified at the trial: LeBel, the Debtor, and Bevis. The Court deemed the Debtor's and LeBel's testimony credible and forthright. Bevis, at times, appeared condescending and visibly frustrated by the Debtor's counsel. His testimony was credible in some respects but often incomplete or evasive, with opportunistic purported confusion.

In the complaint, the Joint Pre-trial Memorandum, and during trial, LeBel asserted that the Debtor engaged in fraud and willfully and maliciously caused LeBel's injury by failing to sell the Restaurant or the Dracut home and by failing to obtain a business loan in order to repay her, rendering the Judgment excepted from discharge pursuant to §§ 523(a)(2) and (a)(6). In addition, LeBel argued that the Debtor's discharge should be denied in its entirety (1) pursuant to § 727(a)(2)(A) on account of the Debtor's payment of $1,500 to another individual within the year preceding the bankruptcy filing with the intent to hinder, delay, or defraud LeBel; (2) pursuant to § 727(a)(3) on account of the Debtor's concealment, destruction, or failure to keep financial records; and (3) pursuant to § 727(a)(4)(A) as a result of various false oaths the Debtor made in or in connection with his bankruptcy case. The Debtor denies LeBel incurred an injury on

5

account of any willful or malicious action, that the Debtor concealed or destroyed any property or records, that the Debtor failed to keep adequate financial records, or that the Debtor knowingly and intentionally made any false representations in connection with the bankruptcy case.

II.     DISCUSSION

    A.        **11 U.S.C. § 727: Denial of Discharge**

As this Court has previously stated,

> Obtaining a discharge and its concomitant financial fresh start is usually the debtor's primary objective in filing a bankruptcy case under Chapter 7 of the Code. As such, a denial of discharge has appropriately been described as the "death penalty of bankruptcy." *Washington 1993, Inc. v. Hudson (In re Hudson)*, 420 B.R. 73, 100 (Bankr. N.D.N.Y. 2009). Absent proof that one of the grounds for denial of discharge under § 727(a)(1)-(12) exists, § 727 provides that a court must grant a discharge. 11 U.S.C. § 727(a) ("The Court *shall* grant the debtor a discharge, unless ....") (emphasis supplied). "In light of the effect on the [d]ebtor, a denial of discharge is an extreme step that should not be taken lightly ..., and, therefore, the provisions of § 727 should be construed liberally in favor of debtors. Objections to discharge should be narrowly construed in furtherance of the Bankruptcy Code's fresh start policy[.]" *Warchol v. Barry (In re Barry)*, 451 B.R. 654, 659 (B.A.P. 1st Cir. 2011) (quoting *Annino, Draper & Moore, P.C. v. Lang (In re Lang)*, 246 B.R. 463, 468 (Bankr. D. Mass. 2000), *aff'd*, 256 B.R. 539 (B.A.P. 1st Cir. 2000)). Consequently, in an action objecting to a debtor's discharge, Bankruptcy Rule 4005 places the burden of proof on the objecting party. The standard of proof for each element of the § 727 provisions is by a preponderance of the evidence, with the objecting party bearing the initial burden of proof and burden of production as to each element. *See Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir.1987). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Id.* at 110 (quoting *Dilworth v. Boothe,* 69 F.2d 621, 624 (5th Cir.1934)).

*Hernandez v. Shove (In re Shove),* 629 B.R. 96, 106-07 (Bankr. D. Mass. 2021), *aff'd* 638 B.R. 1 (B.A.P. 1st Cir. 2022), *aff'd* 83 F.4th 102 (1st Cir. 2023).

"Inasmuch as § 727(a)(2) and (a)(4) require a finding of actual intent in order to deny discharge, the question 'will turn on the credibility and demeanor of the debtor.'" *Id.* at 107 (quoting *Groman v. Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir. 2002)). "To be denied a

discharge under § 727(a)(3), there must be no justification under all of the circumstances of the case for the debtor's act or failure to act." *Id*.

1. <u>Section 727(a)(2)(A): Transfer, Removal, Destruction, Mutilation, or Concealment of Property with Intent to Hinder, Delay, or Defraud</u>

Section 727(a)(2)(A) provides that a bankruptcy court should not grant a debtor a discharge if

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the petition; . . .

11 U.S.C. § 727(a)(2)(A). "Therefore, to prevail on an objection to discharge under § 727(a)(2)(A), a plaintiff must prove, by a preponderance of the evidence, *Antognoni v. Basso (In re Basso)*, 397 B.R. 556, 562 (B.A.P. 1st Cir. 2008), a '(1) transfer or concealment of property (2) that belonged to the debtor (3) less than a year before the bankruptcy petition (4) with actual intent to hinder, delay or defraud a creditor.'" *Hernandez,* 629 B.R. at 107 (quoting *Marrama v. Citizens Bank of Massachusetts (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006)).

LeBel asserts that the Debtor should be denied a discharge pursuant to § 727(a)(2)(A), as the Debtor made a payment of $1,500 to an individual named Greg Schuler by Venmo on January 4, 2021, and, LeBel says, that transfer was made with the intent to hinder, delay, or defraud her. The Debtor answered in interrogatories and reaffirmed through his testimony that the transfer of the $1,500, which was accompanied by a note saying "Rent," was in repayment of a loan from Schuler (a friend of the Debtor's) because Schuler loaned the Debtor $1,500 to pay rent during the COVID-19 pandemic when the Debtor was unemployed.

7

LeBel has alleged that the Debtor contradicted himself by indicating in an interrogatory that the "money was a loan for rent from Greg Schuler, a friend of mine," Pl. Ex. 30, 3, whereas the Debtor testified at trial that the money was *repayment* for a loan. The Court finds and rules that the Debtor's testimony in this regard has been consistent and that the answer to interrogatory was merely poorly phrased. As clarified at trial, the payment by the Debtor to Schuler on January 4, 2021 was for repayment of a loan Schuler made to assist the Debtor with rent.

In further support of her § 727(a)(2)(A) argument related to the $1,500 payment, LeBel says that the transfer violated the December 29, 2020 Superior Court order, implying, it seems, that the Debtor made the transfer with an intent to hinder, delay, or defraud her. The Debtor testified, however, that he was unaware of the hearing because notice was sent to one email address that had been deactivated since 2017, the Restaurant's email had an automated response indicating that it was closed and he no longer monitored that email, and the Debtor faced difficulties receiving mail from the postal service due to his lack of a permanent residence.

The Court found the Debtor's testimony in this regard credible and sees no evidence that the $1,500 payment to Schuler was made with an intent to hinder, delay, or defraud LeBel or any other creditor. For a denial of discharge, one must show the Debtor's actual, rather than constructive, intent to hinder, delay, or defraud. *Lang v. Lang (In re Lang),* 246 B.R. 463, 468 (Bankr. D. Mass. 2000), *aff'd* 256 B.R. 539 (B.A.P. 1st Cir. 2000). The mere fact that the Debtor repaid the loan does not demonstrate an intent to part with money to prevent another creditor from accessing it. *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 54 (2d Cir. 2005).

Had the Debtor transferred a large sum of money, repeatedly transferred lesser sums, or transferred property solely belonging to the Debtor to an insider, an intent to hinder, delay, or

8

defraud might have been indicated. *See, e.g.*, *Marrama*, 445 F.3d at 523 (debtor denied a discharge under § 727(a)(2)(A) where, less than a year before filing for bankruptcy, debtor transferred a vacation home to a spendthrift trust and deposited over $100,000 into an account solely controlled by his girlfriend, with the actual intent to defraud creditors). Instead, the $1,500 transfer was a one-time repayment to an individual that was not an insider, the transfer was in repayment of a loan as opposed to a gift, and the transfer was not an attempt to conceal or protect the Debtor's property from other creditors.

Accordingly, the Court finds and rules that LeBel failed to establish that the $1,500 payment to Schuler involved an intent to hinder, delay, or defraud LeBel or any other creditor, and the Debtor's discharge will not be denied pursuant to § 727(a)(2)(A).

2. Section 727(a)(3): Concealment, Destruction, Mutilation, Falsification, or Failure to Keep or Preserve Recorded Information

Under § 727(a)(3), the court may deny a debtor's discharge if

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case

11 U.S.C. § 727(a)(3). "[T]he initial burden is on the party objecting to discharge to prove two things: (i) that the debtor 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information;' and (ii) that the recorded information was information 'from which the debtor's financial condition or business transactions might be ascertained.'" *Hernandez*, 629 B.R. at 112 (quoting *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116, 120 (Bankr. D. Mass. 2007)).

According to LeBel, the Debtor's discharge should be denied under § 727(a)(3), as the Debtor concealed records and failed to keep adequate records relating to the Debtor's bank accounts. In support of this contention, LeBel points to the fact that the Debtor claimed he could

9

not get certain bank statements from relevant banks, even though LeBel was able to secure those statements through subpoena. The Debtor did, however, provide bank records going back to 2021.

Under the circumstances of this case, the Court finds that the Debtor was justified to decline to personally preserve bank records for several years. The Court sees no indication that the Debtor actively concealed the bank records; he simply did not have them in his possession. Furthermore, LeBel was able to retrieve the pre-2021 bank records via subpoena.

Accordingly, the Court finds and rules that LeBel failed to establish that the Debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information" within the meaning of § 727(a)(3).

3. Section 727(a)(4)(A): False Oath or Account

"The successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Hernandez,* 629 B.R. at 116 (quoting *Matter of Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974)). Accordingly, a debtor may be denied a discharge if

> (4) the debtor knowingly and fraudulently, in or in connection with the case –
>
> (A) made a false oath or account

11 U.S.C. § 727(a)(4)(A). "To support a request for denial of discharge under § 727(a)(4)(A), the plaintiff must prove by a preponderance of the evidence that (1) the debtor knowingly and fraudulently made a false oath and (2) the false statement relates to a material fact." *Hernandez*, 629 B.R. at 116 (citing *Tully*, 818 F.2d at 110; *Lussier v. Sullivan (In re Sullivan)*, 455 B.R. 829, 837 (B.A.P. 1st Cir. 2011)). "[T]he burden of proof rests with the [plaintiff] but once it reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence

10

that he has not committed the offense charged." *Id.*

In the complaint, LeBel alleged that the Debtor knowingly and fraudulently made numerous false oaths in his schedules and statements. She specifically asserted that the Debtor made false oaths within the meaning of § 727(a)(4)(A) regarding his addresses over the last three years as listed on the Statement of Financial Affairs, made false oaths regarding a prior bankruptcy filing in Georgia, and failed to disclose the $1,500 repayment to Schuler.[4] The Debtor largely disputes having made the false oaths, and where errors in the schedules and statements have been established, the Debtor argues that those errors were justified and/or made without fraudulent intent.

a. *Prior Addresses*

In his Statement of Financial Affairs, the Debtor listed the Dracut home as his address from March 2008 to February 2020. However, in the Debtor's response to interrogatories, the Debtor disclosed additional addresses, including an indication that from March 2018 to February 2021 he lived with his girlfriend in Derry, New Hampshire.

When questioned at trial, however, the Debtor testified that the answer in the interrogatories was incorrect, and that he lived in Derry only until February 2020 (and not 2021), when he moved to Shrewsbury, Massachusetts. The Debtor further testified that although he spent a significant amount of time in Derry, he also frequently stayed at the Dracut home. He said his time was divided among a friend's house, his girlfriend's house, and the Dracut home.

---

[4] In the complaint, LeBel also alleged that the Debtor failed to disclose his ownership of a Flagstaff camper trailer. However, LeBel failed to introduce any evidence regarding the trailer at trial. Accordingly, any arguments regarding the Debtor's failure to disclose ownership of the trailer are deemed waived. *See Casanova v. Wyndham Grand Rio Mar Beach Resort & Spa*, 205 F. Supp. 3d 220, 237 (D.P.R. 2016) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.' The Court will not do counsel's work.") (quoting *Glob. NAPs, Inc. v. Verizon New England, Inc.*, 706 F.3d 8, 16 (1st Cir. 2013)) (internal citation omitted).

11

In *In re Howard*, the Bankruptcy Court for the District of New Hampshire analyzed whether the omission of a debtor's address in the bankruptcy schedules and statements warranted a denial of the debtor's discharge under § 727(a)(4)(A). *Flanagan v. Howard (In re Howard)*, 361 B.R. 20, 22 (Bankr. D.N.H. 2007). In that case, the plaintiff and debtor (formerly in a relationship) jointly financed a car and signed an agreement detailing their liabilities. *Id.* The debtor removed the car to another state and failed to make payments, leading to the vehicle being repossessed and damaged. *Id.* The creditor sued both parties, and the debtor subsequently filed for Chapter 7 bankruptcy. *Id.* The plaintiff then filed a complaint seeking to deny the debtor's discharge, based (in part) on an allegation that the debtor omitted his prior addresses, including a residence in Colorado and a residence with the plaintiff, from his schedules and statements. *Id.* at 27.

The *Howard* court held that under § 727(a)(4)(A), a debtor may be denied discharge if he "knowingly and fraudulently, in or in connection with the case... made a false oath or account," noting that the "material facts must be "real and substantial, not merely technical and conjectural." *Id.* at 26, 27. The court found that although the debtor did live with the plaintiff for a short period and in Colorado for a time, the court concluded that the Debtor's discharge should not be denied on that ground, as "there [was] no evidence that these omissions are due to anything approaching fraud." *Id.* at 27. Similarly, here, LeBel has not established that the omission of the addresses on the petition was material or done with a fraudulent intent.

In certain circumstances, a "reckless indifference to the truth" may equate to fraud under § 727(a)(4)(A), *see Tully*, 818 F.2d 106 at 113, and the Debtor certainly lacked the expected care in disclosing his prior addresses on his schedules and statements. However, in order to deny the Debtor's discharge under § 727(a)(4)(A), the Court must find that the omission of the addresses

12

was material, e.g., the omissions relate directly to the Debtor's business transactions and estate or affect the discovery of assets and the overall bankruptcy proceedings. *Id.* at 111. Stated another way, the omission of a prior address would be material if the Debtor had (1) owned and sold real estate that could have been part of the bankruptcy estate or (2) claimed exemptions that he was not entitled to claim.

The Debtor resided irregularly at his girlfriend's house in New Hampshire. The property was not an asset of the Debtor and had no bearing on the Debtor's bankruptcy estate. In addition, according to the Debtor's testimony, he would be entitled to claim Massachusetts exemptions. Although he lived in New Hampshire within the 730 days before filing his petition, he resided in Massachusetts for the requisite 180 days prior to that. 11 U.S.C. § 522(b)(3)(A). In Massachusetts, one may choose between state and federal exemptions, and the Debtor chose federal exemptions. If this were not the case, his omission may have been material. *Howard,* 361 B.R. at 26.

Accordingly, while debtors cannot be cavalier or indifferent in completing their schedules and statements, because the Court finds that the omission of the Debtor's prior out-of-state address is not material in this particular case, the Court will not deny the Debtor a discharge on that ground under § 727(a)(4)(A).

    b. *Georgia Bankruptcy Case*

LeBel further alleges that the Debtor knowingly and fraudulently perjured himself during the meeting of creditors held on August 30, 2021 regarding a prior bankruptcy filing. The Debtor did not list any prior bankruptcy cases on his petition. And at the meeting of creditors, when questioned about prior bankruptcy filings, the Debtor initially stated that he had not previously filed for bankruptcy. However, LeBel questioned the Debtor further, prompting the Debtor to

13

correct himself and acknowledge that he did file a bankruptcy petition in Georgia on November 17, 1999, but noted that the case was subsequently dismissed on February 10, 2000.

The Debtor says that he misunderstood the Chapter 7 trustee's inquiry, explaining that he "never followed through" with the previous bankruptcy filing. Apr. 25 Tr. 167:17-18. This Court found the Debtor's testimony on this issue to be credible and finds the Debtor's mistake to be reasonable. The bankruptcy petition only requires a debtor to disclose prior bankruptcy filings made within the last eight years, whereas the filing in Georgia predated the filing of the present case by almost twenty-one years. And, upon further clarifying questioning, the Debtor readily admitted that a previous case had been filed. Accordingly, the Court cannot find that the Debtor "knowingly and fraudulently" made a false statement regarding the Georgia bankruptcy filing sufficient to deny the Debtor a discharge under § 727(a)(4)(A).

    c.  *$1,500 Repayment to Schuler*

LeBel maintains that the $1,500 loan repayment to Schuler should have been disclosed in the bankruptcy petition and that failure to disclose the repayment is grounds for denial of the Debtor's discharge under § 727(a)(4)(A).

For an individual whose debts are primarily consumer debts (as is the case here), Question 6 of the Statement of Financial Affairs requires a debtor to disclose payments of $600 or more made in the 90 days prior to the filing. The Debtor was not required to disclose the repayment to Schuler in answer to Question 6, as the payment was made more than 90 days prepetition. Questions 7 and 8 of the Statement of Financial Affairs require a debtor to disclose payments to "insiders" on account of prepetition debts made within 1 year prior to the bankruptcy filing. The Debtor was also not required to disclose the payment to Schuler in response to Questions 7 or 8, because Schuler is merely a friend of the Debtor's, not a business partner or relative, and thus is

14

not an "insider" as defined by § 101(31) of the Code.

As the Debtor was not required to disclose the $1,500 payment to Schuler in the schedules and statements, the Court cannot find that the Debtor made a false oath or account on account of that nondisclosure under § 727(a)(4)(A).

### B.  11 U.S.C. § 523(a)(2)(A): Debt Obtained by False Pretenses or Fraud

Section 523(a)(2)(A) of the Bankruptcy Code excepts from an individual debtor's discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, **to the extent obtained by** – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). (emphasis supplied)

To except a debt from discharge under § 523(a)(2)(A), a creditor must establish each of the following elements:

> 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the false statement, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 66 (1st Cir. 2012) (citing *In re Spigel*, 260 F.3d 27, 32 (1st Cir. 2001)). Each element of a § 523(a) claim must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). And the creditor contesting dischargeability under § 523(a) bears both the burden of proof and burden of production as to each element. *Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997).

LeBel has alleged several false statements made by the Debtor. LeBel testified that in the fall of 2016, the Debtor said that Restaurant was not making any money and the Debtor intended to apply for a business loan, and in 2017, the Debtor told LeBel that he was going to try to sell the

15

Restaurant. LeBel argues that the Debtor was being deceitful in both of those representations, possibly with the intent of delaying LeBel from taking legal action against him. LeBel further claims that the Debtor's reluctance to provide her with copies of financial statements indicates a deliberate attempt to conceal the Restaurant's profits. LeBel also implies the Debtor's payments for personal expenses, vacations, and repayment to another creditor (Bevis's brother) instead of her demonstrates an intent not to repay LeBel.[5]

To begin with, LeBel has not demonstrated that the Debtor's stated or implied representation that he intended to repay LeBel's loans at the time they were made were false, nor has she demonstrated that she relied on any false statement of the Debtor in extending the loans to fund the Restaurant. If a debtor intends to perform at the time the debtor made a promise, "but subsequently decided that he could not or would not so perform, then his initial representation was not false when made." *Rodowicz v. Massachusetts Mutual Life Ins. Co.*, 192 F.3d 162, 787 (1st Cir. 1999). The Debtor's mere failure to repay the loan after having promised to do so is insufficient to render a debt nondischargeable under § 523(a)(2)(A). And the Court does not find that the Debtor's subsequent use of the Debtor's income for personal expenses, vacations, or payments to other creditors, or the Debtor's failure to sell the Restaurant or secure a business loan demonstrate an intent to defraud at the time the loan was made. In fact, Bevis testified at trial that it was he who asked LeBel to make the initial loan, and the evidence at trial demonstrated that the Debtor did, indeed, use the loans to open and operate the Restaurant.

---

[5] LeBel also alleged that the Debtor falsified J&D Investment's federal tax return for 2017. With regard to the 2017 tax return, Lebel mistakenly pointed to a notation in the return regarding sales, meals, tax payable of $49,319 and, knowing that no meals taxes were paid, Lebel believed the Debtor committed "fraud against the Commonwealth of Massachusetts." Apr. 25 Tr. 29:8-14. However, the outstanding meals taxes *were* disclosed in the "Other Current Liabilities" section of the return. Pl. Ex 21.

16

Even if the Debtor's statements regarding his intent to apply for a business loan or sell the Restaurant were false, and even if those statements were made to delay LeBel from taking legal action, they were not statements made to induce LeBel to lend the Debtor, Boneat, and J&D Investment the $60,000. The majority of the allegedly false statements relied upon by LeBel in support of her § 523(a)(2)(A) argument were made many months after the loans were extended and after the Debtor opened the Restaurant, and thus could not have been used to "obtain" the loans when made.

Accordingly, the Court concludes that LeBel has failed to meet her burden of proof that she justifiably relied on a false statement made by the Debtor with the intent to induce her to loan the Debtor funds, and the debt will not be excepted from discharge pursuant to § 523(a)(2)(A).

C. 11 U.S.C. § 523(a)(6): Willful and Malicious Injury

"Pursuant to § 523(a)(6), any debt 'for willful and malicious injury by the debtor to another entity or to the property of another entity,' is excepted from a debtor's general discharge under § 727. 11 U.S.C. § 523(a)(6). To succeed on a § 523(a)(6) nondischargeability claim, the creditor must prove, by a preponderance of the evidence, that '(1) the debtor injured [the creditor] or [the creditor's] property; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious.'" *T.H. Glennon Co., Inc. v. Monday (In re Monday)*, 649 B.R. 354, 363 (Bankr. D. Mass. 2023) (quoting *O'Rorke v. Porcaro (In re Porcaro)*, 545 B.R. 384, 396 (B.A.P. 1st Cir. 2016)).

"'[N]ondischargeability under [§ 523(a)(6)] . . . requires "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."' [*B.B. v. Bradley (In re Bradley)*, 466 B.R. 582, 587 (B.A.P. 1st Cir. 2012)] (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)). Intentional actions that are known by the debtor

17

to be 'substantially certain to cause injury' are also considered to be 'willful' within the meaning of § 523(a)(6). *Id.* (quoting *Hermosilla v. Hermosilla (In re Hermosilla),* 430 B.R. 13, 22 (Bankr. D. Mass. 2010))." *Monday*, 649 B.R. at 364. And "§ 523(a)(6)'s element of 'malice' requires the creditor to show that the injury was caused 'without just cause or excuse.'" *Porcaro*, 545 B.R. at 396 (quoting *Bradley*, 466 B.R. at 587; citing *Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur)*, 737 F.3d 814, 818 (1st Cir. 2013)) (internal quotations omitted).

"Absent evidence of intent to injure, and of malice, the failure to repay, even if combined with payment to other creditors, does not constitute a "willful and malicious act" under § 523(a)(6)." *Pappas v. Gucciardo (In re Gucciardo)*, 577 B.R. 23, 38 (Bankr. E.D.N.Y. 2017) (citing *Long v. Green (In re Green),* Nos. 06-35727 (CGM), 06-9086 (CGM), 2007 Bankr. LEXIS 1691, at *20 (Bankr. S.D.N.Y. May 11, 2007) (stating that "the mere fact that [the debtor] chose to pay other creditors, but not the [p]laintiffs is in no way indicative of a willful and malicious intent to injure"); *Al-Naji v. Al-Naji (In re Al–Naji)*, 521 B.R. 65, 70 (Bankr. W.D.N.Y. 2014) ("When resources are insufficient to allow payment of all creditors, the non-payment of any particular creditor will serve as evidence not of malice, but of the reality that someone will be left unpaid")); *see also WLC Enterprises v. Rylant (In re Rylant)*, 594 B.R. 783, 789 (Bankr. D.N.M. 2018) (stating that "in general, the failure to pay a debt does not come within § 523(a)(6)" and collecting cases).

In support of her claim of willful and malicious injury, LeBel alleges that the Debtor intentionally and knowingly would not close on selling the Restaurant, failed to make mortgage payments, which led to foreclosure of the Dracut home, purposely failed to sell the Dracut home by private sale which may have resulted in proceeds available to LeBel, and failed to disclose that meals taxes were not being paid, thereby preventing LeBel from recovering on her Judgment.

18

LeBel contends that these actions were deliberate and malicious, warranting an exception to discharge under § 523(a)(6).

Regarding the failure to sell the Restaurant, the Court is persuaded that the Debtor did not intentionally and maliciously decline to sell the Restaurant in an effort to avoid repaying LeBel. First, the Court questions whether the Restaurant could have been sold for an amount sufficient to satisfy the loans to LeBel given the inability to transfer the liquor license due to the outstanding meals taxes. In addition, the Court believes the Debtor's testimony that he was reluctant to sell, as he was hopeful that the business would improve.

Regarding the failure to make mortgage payments, LeBel has alleged that the Debtor deliberately defaulted to force a foreclosure and thwart her efforts to recover her judgment. However, pursuant to the divorce decree, it was Boneat, and not the Debtor, who was financially responsible for paying the mortgage. LeBel also alleges that the Debtor prevented the private sale of the Dracut home, which may have realized proceeds in excess of the mortgage (which would have been available to repay LeBel). The Debtor, in turn, implied through testimony that it was LeBel who would not negotiate the release of her lien to facilitate a sale, preventing the private sale of the Dracut home. Whether or not that is true, nothing in the Debtor's testimony or other evidence presented at trial persuades the Court that the Debtor intentionally prevented the sale of the Dracut home.

As to the failure to pay meals tax, the Court cannot find that the Debtor's failure to pay was done with the intent to cause harm to LeBel. The Debtor testified that he was unaware of the requirement to make separate meals tax payments, as his experience as a general manager for a corporate restaurant did not include making such payments. When he learned of the substantial tax debt accrued, the Debtor took action to address it, including applying for a business loan and

19

attempting to sell the Restaurant. His decision to contemplate selling the Restaurant due to financial constraints suggests a genuine concern regarding his ability to repay creditors and is not reflective of any deliberate attempt to sabotage his business to thwart LeBel's recovery efforts. In fact, it seems farfetched that the Debtor intentionally and knowingly crippled his business to prevent LeBel from recovering her judgment when that was his livelihood.

Accordingly, the Court finds that LeBel has failed to demonstrate, by a preponderance of the evidence, that LeBel's claim arose from a willful and malicious injury within the meaning of § 523(a)(6).

IV.    CONCLUSION

For all of the foregoing reasons, the Court will issue judgment in favor the Debtor on all counts of the Complaint. A separate judgment in conformity with this Memorandum will issue forthwith.

DATED: August 22 2024           By the Court,

                                _____
                                Elizabeth D. Katz
                                United States Bankruptcy Judge